```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF RHODE ISLAND
_____
                              )
J. MART, INC., d/b/a CASS     )
AVE. FOOD MART,               )
                              )
          Plaintiff,          )
                              )
     v.                       )    C.A. No. 13-424 S
                              )
UNITED STATES DEPARTMENT      )
OF AGRICULTURE,               )
                              )
          Defendant.          )
_____)
```

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

Plaintiff, J. Mart, Inc., d/b/a Cass Ave. Food Mart ("J. Mart"), has brought suit against the United States Department of Agriculture ("USDA") seeking relief following the USDA's permanent disqualification of J. Mart from participation in the Supplemental Nutrition Assistance Program ("SNAP"). Now pending before this Court is a motion for summary judgment filed by the USDA (ECF No. 7). For the reasons set forth below, the USDA's motion is GRANTED.

I. Facts[1]

J. Mart is a small convenience store located in Woonsocket, Rhode Island. Its roughly 800 square feet of retail space are

---

[1] Except where noted, the facts derive from the Administrative Record, appended as Exhibit 1 to the USDA's memorandum of law in support of its motion for summary judgment (ECF No. 7-2 et seq.).

occupied by standard convenience store fare including canned goods, snack products, milk, eggs, and lottery tickets.

Until recently, J. Mart was eligible to accept payment for qualifying food purchases from customers through SNAP. SNAP, administered by the Food and Nutrition Service ("FNS") of the USDA, is intended to raise the levels of nutrition among low-income households by providing food stamp allotments. See 7 U.S.C. § 2011. SNAP participants receive electronic benefit ("EBT") cards, which can be used at eligible food retailers to purchase food products. In making a purchase, the retailer swipes the EBT card, the SNAP participant enters a personal identification number, and the amount of the purchase is deducted from the SNAP participant's monthly allotment. Simultaneously, FNS credits the bank account of the retailer for the amount of the purchase.

As part of its effort to identify and eliminate fraud, FNS closely monitors EBT transactions. In February 2013, FNS identified a series of transactions at J. Mart that were indicative of fraudulent activity. Based on these transactions, the USDA theorized that J. Mart was in the practice of accepting EBT funds in exchange for cash, rather than food products, a practice known as "trafficking." On February 23, FNS personnel conducted a store visit to assess the facility, and to review J. Mart's EBT transactions for the preceding several months.

2

On March 19, 2013, FNS sent a letter to Jerry Cherian ("Cherian"), J. Mart's owner, informing him that FNS was considering permanently disqualifying J. Mart from SNAP based on suspected trafficking. The letter informed Cherian that he could submit a reply addressing the charges, and that FNS would consider any such reply in making a final determination.

The letter also set forth the basis on which FNS was considering revoking J. Mart's eligibility to accept EBT funds. The FNS investigation into J. Mart's EBT transactions from November 2012 to January 2013 had revealed five traits indicative of fraud. First, a disproportionate number of J. Mart's EBT transactions ended in $.00 or $.50. While, from a statistical standpoint, approximately one percent of transactions should end in $.00 and one percent should end in $.50, FNS determined that 9.4% of J. Mart's EBT transactions ended in $.00 and 4.9% ended in $.50. FNS suggests that this indicates the manual entry of certain figures to facilitate fraudulent cash for EBT funds transactions, rather than randomized totals that would result from food purchases.

Second, FNS identified a large number of consecutive EBT transactions that occurred within a short period of time, ranging from 42 seconds to just under eight minutes, often for high dollar amounts. For example, FNS identified two transactions on November 1, 2012. In the first transaction, at

9:18:17 A.M., an EBT card was swiped for $208.03. Just 55 seconds later, at 9:19:12 A.M., an EBT card was swiped for $321.07. FNS suggests that, given the small size of the store, the basic and inexpensive nature of the food items for sale, the fact that there are no shopping carts and only a few hand baskets, and the fact that the checkout counter is prohibitively small, it would be practically impossible to process transactions of this nature within such a short period of time.

Third, FNS identified many transactions in which individual SNAP participants executed multiple transactions within a short period of time, ranging from one minute to 24 hours, often for amounts representing a significant percentage of that participant's monthly SNAP allotment. For example, on November 1, 2012, one participant made a purchase for $232.10, then just 79 seconds later, made a second purchase for $76.57. FNS points to further data which indicates that, in many instances, individuals who had made successive purchases at J. Mart, also made smaller purchases at better-stocked and more competitively-priced grocery stores in the vicinity on the same day.

Fourth, FNS identified 95 EBT accounts that had exhausted the majority of the account's monthly SNAP benefits in one or a few transactions at J. Mart. This was a red flag, FNS concluded, based on the fact that unlike neighboring grocery stores, J. Mart does not sell fresh meat or vegetables.

Furthermore, FNS suggests, these transactions depart significantly from the typical shopping pattern of SNAP participants in which the participant makes a series of small purchases throughout the month, each totaling on average approximately $30.

Finally, the FNS investigation revealed dozens of transactions at J. Mart in which customers using EBT cards made very large purchases. For example, between November 2012 and January 2013, there were some 20 purchases that exceeded $300, including one on January 2, 2013 for $445.70. FNS suggests that this is indicative of fraud based again on factors including J. Mart's small size and limited product selection.

J. Mart, through an accountant, sent a response to the USDA's letter on March 26, 2013. Therein, J. Mart attempted to provide explanations for the statistical evidence that the USDA had presented.

With respect to the disproportionate number of transactions ending in $.00 and $.50, J. Mart explained that common cumulative purchases (milk, eggs, and cereal, for example) produce totals ending in round numbers. Addressing the data showing rapid, successive transactions, J. Mart reasoned that customers often travel to the store together to make purchases and J. Mart aggregates those large purchases, while simultaneously handling smaller transactions for other

5

customers. In response to the data showing repeated transactions by the same EBT account, J. Mart explained that customers would often complete one transaction, place items in their car or return home, then return to complete a second transaction. As for the data showing the significant depletion of monthly SNAP funds in individual or successive transactions, J. Mart reasoned that many of its customers purchase frozen foods in large quantities. Finally, addressing the issue of large purchases, J. Mart stated that many of its products, including baby food, are quite expensive.

Two days later, on March 28, the USDA responded, informing J. Mart that it had considered the proffered explanations, but that those explanations had been insufficient to demonstrate an absence of fraud. As a result, the USDA wrote, J. Mart was to be permanently disqualified from participation in SNAP.[2] J. Mart's EBT processing machine was disabled on March 29, 2013.

Thereafter, in an undated letter, Cherian requested an appeal. Cherian largely restated the contents of the previous letter in which J. Mart had attempted to offer explanations for the data that FNS had identified.

The USDA responded in a letter dated April 8, 2013, requesting additional information to support J. Mart's appeal.

---

[2] The Code of Federal Regulations specifies that a retailer that is caught trafficking will be permanently disqualified from participating in SNAP. 7 C.F.R. § 278.6(e)(1)(i).

6

The USDA did not receive a response. On May 7, the USDA issued its final decision, a comprehensive assessment of the data which concluded that there was sufficient evidence to support J. Mart's permanent disqualification from SNAP. In June 2013, J. Mart filed suit seeking a reversal of the disqualification, and the instant motion for summary judgment followed.

II. Discussion

Summary judgment is appropriate when, viewing the record in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009). "A genuine issue of fact exists where the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Taylor, 576 F.3d at 24 (internal citation and quotation marks omitted).

A store seeking judicial review of permanent disqualification by the USDA, after an unsuccessful administrative review, bears the burden of proving, by a preponderance of the evidence, that the agency's determination is invalid. See Fells v. United States, 627 F.3d 1250, 1253 (7th Cir. 2010); Hajifarah v. United States, 779 F. Supp. 2d 191, 204 (D. Me. 2011). Where the store fails to meet this burden and fails to demonstrate a material dispute of fact as to

the existence of a violation, the entry of summary judgment is appropriate. Kahin v. United States, 101 F. Supp. 2d 1299, 1302 (S.D. Cal. 2000). While this Court reviews de novo the USDA's determination as to whether a violation occurred, if the Court accepts the USDA's determination, review of the sanction imposed is limited to whether such sanction was arbitrary or capricious. See Objio v. United States, 113 F. Supp. 2d 204, 208 (D. Mass. 2000) (citing Broad St. Food Mkt., Inc. v. United States, 720 F.2d 217, 220 (1st Cir. 1983)).

Importantly, J. Mart has not submitted evidence rebutting the data that the USDA suggests is indicative of fraud. Rather, J. Mart attempted first to explain the data patterns in correspondence with the USDA, and now asserts in opposition to the motion for summary judgment that the USDA's determination was "based on speculation and conjecture." (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Mem.") 2, ECF No. 9.) J. Mart has not met its burden to prove, by a preponderance of the evidence, that the USDA's determination that it engaged in trafficking was invalid. See Hajifarah, 779 F. Supp. 2d at 204. Nor has J. Mart proven the existence of material factual disputes that are not easily refuted by the overwhelming statistical evidence that the USDA presents. See Kahin, 101 F. Supp. 2d at 1302.

8

Indeed, courts have routinely granted summary judgment for the government in similar cases involving analogous data patterns. See, e.g., McClain's Mkt. v. United States, 214 F. App'x 502, 504 (6th Cir. 2006) (multiple large transactions within a short time period despite small store size and limited inventory, consecutive large transactions by single households, excessive large transactions); Idias v. United States, 359 F.3d 695, 696 (4th Cir. 2004) (excessive large transactions, consecutive transactions by the same cardholder); Kahin, 101 F. Supp. 2d at 1300 (rapid, repetitive debits in short time periods, excessive round dollar transactions, high number of balance depletion transactions, excessive large transactions); Young Choi Inc. v. United States, 639 F. Supp. 2d 1169, 1174 (D. Haw. 2009) (large consecutive transactions, multiple transactions by single households, depletion of accounts through large purchases, high dollar transactions not commensurate with size and inventory).

In correspondence with the USDA, J. Mart put forth a series of explanations in an attempt to justify the data patterns that the USDA suggests are indicative of fraud.  Although J. Mart does not include these explanations in filings with this Court, they are nevertheless contained in the record as the USDA correspondence was appended to the USDA's memorandum of law in support of its motion for summary judgment.

9

The explanations are farfetched. For example, when confronted with data indicating that the store had processed large transactions consecutively, sometimes just seconds apart, J. Mart suggested that many of its customers travel to the store together. This explanation overlooks the practical impossibility of multiple shoppers accumulating hundreds of dollars' worth of items in a small convenience store (without the aid of shopping carts), then both customers checking out and paying at a single cash register within seconds or minutes of each other. Similarly, when confronted with data showing a slew of hugely expensive purchases, many in excess of $300, J. Mart explained that it sells expensive items, including baby formula, rice, juice, and frozen foods. This Court cannot disagree with the USDA's suggestion that the sheer number of such transactions, given J. Mart's size and limited inventory, defies common sense. See, e.g., Kahin, 101 F. Supp. 2d at 1303 (noting that while a storeowner's explanations of unusual EBT transactions might tend to negate certain negative inferences and raise some material issues of fact, summary judgment is appropriate where those explanations do not account for all suspicious activity).

In opposition to the USDA's motion for summary judgment, J. Mart asserts, in a two page memorandum of law, that the USDA's data lacks "any scientific analysis" and that the USDA has

10

"failed to show any evidence of illegal activity." (Pl.'s Mem. 1-2.) These conclusory, unsubstantiated, and plainly incorrect assertions are insufficient to create genuine issues of material fact that the USDA's findings, supported by ample statistical data and an in-person store visit, were invalid.

J. Mart does not challenge the severity of the sanction imposed. Were it to do so, this Court's review would be limited to determining whether such sanction was arbitrary or capricious. Broad St. Food Mkt., 720 F.2d at 220. Given this deferential standard, and the statutory prescription for permanent disqualification for trafficking violations, 7 C.F.R. § 278.6(e)(1)(i), it cannot be said that the USDA's chosen sanction was arbitrary or capricious.

III. Conclusion

For the foregoing reasons, the USDA's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

*/s/ William E. Smith*
William E. Smith
United States District Judge
Date: October 23, 2013

11